## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

UNITED STATES OF AMERICA

v.

JOSE MANUEL LOPEZ, *et al.*,

CRIMINAL CASE NO.

3:14-cr-00021-TCB-RGV

## MAGISTRATE JUDGE'S FINAL REPORT,
## RECOMMENDATION, AND ORDER

Defendant Jose Manuel Lopez ("Lopez") is charged along with several co-defendants in a superseding indictment with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846.  [Doc. 22].  Lopez is also charged with possessing with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2, and possession of a firearm in furtherance of the drug trafficking crimes charged in the superseding indictment, in violation of 18 U.S.C. §§ 924(c) and 2.  [Id.].  Lopez has filed a motion to suppress statements, [Doc. 152], and following an evidentiary hearing on the motion,[1] [Doc. 191], the parties filed post-hearing briefs, [Docs. 218, 224, & 228].  For the reasons that follow, it is **RECOMMENDED** that Lopez's motion, [Doc. 152], be **DENIED**.

---

[1] See [Doc. 205] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at ___)."

## I.  STATEMENT OF FACTS

On July 1, 2014, law enforcement officers arrested Lopez and co-defendant Elmer Villalobos Ochoa ("Ochoa") on state drug trafficking charges after they arrived at the residence of another co-defendant, Harland Orlando Jackson, a/k/a "OJ," with five kilograms of crystal methamphetamine hidden in a diaper box located in the trunk of a Nissan 350z driven by Lopez and in which Ochoa was a passenger.[2]  (Tr. at 5, 8-9).  Lopez made statements to law enforcement officers following his arrest on July 1, 2014, and subsequently on July 11, July 16, and July 22, 2014, while in custody at the Meriwether County Jail.  Lopez moved to suppress all statements he made following his arrest, [Doc. 152], but at the conclusion of the evidentiary hearing, the government announced that it would not seek to offer the statements Lopez made on July 1,[3] (Tr. at 78-79), and in his post-hearing brief, Lopez no longer challenges the statements he made on  July 11.[4]  See [Doc. 218 at 2].  Thus,

---

[2] A firearm was also recovered from the vehicle.  (Tr. at 8, 24).

[3] Lopez asserts that the government "concede[d] to the inadmissibility" of the July 1 statement, [Doc. 218 at 1], but the government disputes his contention, [Doc. 224 at 3 n.2], and the record reflects that the prosecutor merely confirmed at the conclusion of the hearing that the government did not intend to offer any statements Lopez made on July 1, (Tr. at 78-79).

[4] Lopez made spontaneous admissions of wrongdoing and about seeking forgiveness for his sins to an officer who was taking DNA samples from him as part of the arrest packet on July 11.  (Tr. at 45-46).

the only statements at issue are those he made on July 16 and July 22, 2014.

A.    <u>July 16, 2014 Statements</u>

On July 16, 2014, Meriwether County Sheriff's Narcotics Task Force Sergeant Christopher Worden ("Sgt. Worden"), went to Lopez's cell at the Meriwether County Jail to deliver a personal notice of service regarding forfeiture of Lopez's vehicle, the Nissan 350z in which the firearm and methamphetamine had been discovered on July 1, 2014. (Tr. at 12). While Sgt. Worden was at his cell, Lopez said that he wanted to "help himself out," and he requested to speak with law enforcement officers, including agents of the Drug Enforcement Administration ("DEA"), about providing information. (<u>Id.</u>). Sgt. Worden responded that his cell was not the appropriate place to have the conversation, and he told Lopez that he would contact DEA Special Agent Frazier Moreman ("Agent Moreman"), about his request. (<u>Id.</u>). Sgt. Worden did not ask Lopez any questions about the case, nor did he make any threats or promises to Lopez. Sgt. Worden testified that he did not provide Lopez with <u>Miranda</u>[5] warnings because Lopez "spontaneously started telling [him] that he wanted to help himself out of this situation." (Tr. at 13-14). After his conversation with Lopez, Sgt. Worden called Agent Moreman to notify him that Lopez requested to speak with him. (Tr. at 13). When Sgt. Worden reached him

_____

[5] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

by phone, Agent Moreman was already in route to the Meriwether County jail to pick up a check for currency seized on July 1 that was subject to forfeiture. (Tr. at 14, 57-59).

Upon arriving at the Meriwether County Jail, Agent Moreman picked up the forfeiture check and then met with Sgt. Worden in the deputy room at the jail.[6] (Tr. at 59-60). Sgt. Worden requested that Lopez be brought to the deputy room, and other jail staff escorted Lopez from his cell to the room. (Id.). When he arrived at the deputy room, Lopez was handcuffed and wearing his inmate uniform. (Tr. at 33). Agent Moreman, Sgt. Worden, and Lopez sat in "rolly lounge chairs" in the deputy room, and Agent Moreman asked Lopez, "What do you want to talk to us about?" (Tr. at 15, 33, 60). Lopez replied that he wanted to see about "helping himself out," (Tr. at 16, 60), but he said, "Poppy, we're done," because "they are not going to trust us anymore," which Sgt. Worden understood to mean that Lopez could not work for the drug cartel any longer since he had been in jail, and Lopez said that his brother was "locked up in Mexico for methamphetamine," and Lopez "want[ed] to be there for [his own] kids," (Tr. at 16).

---

[6] The deputy room, approximately 25 feet by 30 feet in dimension, is a "completely open room" akin to a common area. (Tr. at 15, 71, 76). Inside the deputy room are offices, computers, chairs, a photocopier, a safe, and other office supplies. (Tr. at 14, 76). Jailers, law enforcement officers, and citizens filing reports "constantly" pass in-and-out the room without knocking. (Tr. at 15, 76).

4

Sgt. Worden testified that he did not provide <u>Miranda</u> warnings to Lopez because he understood that another officer had previously read him his rights on July 1,[7] and because Lopez had initiated the conversation by asking to speak with law enforcement agents about helping himself out, and he and Agent Moreman were not going to ask Lopez specific questions. (Tr. at 17). Agent Moreman also testified that they were not interviewing Lopez and did not ask him any questions. (Tr. at 71). The conversation with Lopez was "laid back" and lasted about five to ten minutes. (Tr. at 17, 60). Agent Moreman concluded the conversation by informing Lopez that he would return to the jail on another day if Lopez wanted to cooperate, and Agent Moreman told him that cooperating would require Lopez to provide names, numbers, and addresses, and Lopez seemed receptive, so Agent Moreman subsequently scheduled a "formal interview" for July 22, 2014. (Tr. at 61).

**B.    <u>July 22, 2014 Statements</u>**

Agent Moreman and DEA Intel Research Specialist James C. White ("IRS White") interviewed Lopez in an interview room at the jail on July 22, 2014. (Tr. at

---

[7] Sgt. Worden testified that he believed DEA Special Agent Rac Brown had advised Lopez of his <u>Miranda</u> rights before speaking to him following his arrest on July 1, but Sgt. Worden acknowledged that he did not actually hear anyone advise Lopez of his rights on that day. (Tr. at 28, 38). The government did not present any testimony at the evidentiary hearing establishing that Lopez was actually provided <u>Miranda</u> warnings on July 1, 2014.

62).[8]  Before beginning the interview, Agent Moreman read Lopez his <u>Miranda</u>

warnings in English from a DEA-13A card, and Lopez verbally acknowledged that

he understood his rights, and he waived his rights and agreed to speak with the

agents.  (Tr. at 63-64, 77).   Agent Moreman testified that the interview was

conducted in English and that Lopez appeared to understand the questions and was

able to converse with the agents.  (Tr. at 77).  The tone of the interview was a

"friendly conversation," and Agent Moreman testified that he did not intimidate or

mistreat Lopez or observe anyone else do so.  (Tr. at 66).  Although Agent Moreman

had a firearm, it remained holstered and concealed throughout the interview, and

IRS White did not carry a firearm.   (Tr. at 65-66).   Lopez made inculpatory

statements regarding his participation in the drug trafficking conspiracy during the

course of the interview.  (Tr. at 64-65).  Agent Moreman told Lopez that he would

make the prosecutor aware of any cooperation he provided, but neither he nor

anyone else made any promises to Lopez.  (Tr. at 65-66).

## II.  DISCUSSION

Lopez argues that the statements he made on July 16, 2014, should be

suppressed because he was subjected to custodial interrogation without first

---

[8] Lopez had on leg shackles during the interview, but Agent Moreman could
not recall whether Lopez remained handcuffed.  (Tr. at 63).  The interview room had
a table and three chairs and a door on both ends of the room.  (<u>Id.</u>).

receiving <u>Miranda</u> warnings, and that his statements on July 22, 2014, are due to be suppressed because the government has not demonstrated that he was properly advised of his <u>Miranda</u> rights and validly waived his rights.  [Doc. 218 at 7].  The government responds that <u>Miranda</u> warnings were not required on July 16 because Lopez initiated the communication with the agents, and he was not subjected to interrogation on that date.  [Doc. 224 at 9-12].  With respect to the July 22 interview, the government contends that the preponderance of the evidence establishes that Lopez knowingly and voluntarily waived his rights after receiving <u>Miranda</u> warnings on that day.  [<u>Id.</u> at 13-18].

## A.   <u>July 16, 2014 Statements</u>

The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In <u>Miranda</u>, the Supreme Court "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his Miranda rights and freely decides to forgo those rights."[9] <u>New York v. Quarles</u>, 467 U.S. 649, 654 (1984)

---

[9] Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." <u>Miranda</u>, 384 U.S. at 467-70.  <u>Miranda</u> further requires that law enforcement respect the suspect's decision to exercise his rights as outlined

(footnote omitted).  Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation."  United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).  However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'"  United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).  The "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in custody itself."  Innis, 446 U.S. at 300.  Lopez bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[10]

_____

in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id. at 473-74.  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

[10] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209

It is undisputed that Lopez was in custody at the Meriwether County Jail on July 16, 2014, when Sgt. Worden came to his cell to deliver a personal notice of service regarding forfeiture of the Nissan 350z and when he subsequently met with Agent Moreman and Sgt. Worden in the deputy room at the jail. (Tr. at 12). However, Lopez has failed to show that the statements he made on that date were in response to interrogation. Instead, the evidence demonstrates that Lopez requested to meet with law enforcement officers, including agents of the DEA, so that he could try to "help himself out." (Id.). In response to Lopez's request, Sgt. Worden contacted Agent Moreman, who was already in route to the jail to pick up a forfeiture check. (Tr. at 14, 57-59). After Agent Moreman arrived at the jail, he and Sgt. Worden met with Lopez as he had requested, and Agent Moreman asked Lopez, "What do you want to talk to us about?" (Tr. at 15, 33, 60). Lopez replied that he wanted to see about "helping himself out," (Tr. at 16, 60), and proceeded to explain his motivation for wanting to talk to the agents, (Tr. at 16). Agent Moreman and Sgt. Worden both testified that they had about a ten minute conversation with Lopez on July 16, but did not conduct an interview or question him. (Tr. at 17, 71).

---

(11th Cir. 1981) (*en banc*).

9

Instead, Agent Moreman scheduled an interview with Lopez for July 22, 2014.  (Tr. at 61).

Lopez has not argued that his conversation at the cell with Sgt. Worden amounted to interrogation requiring Miranda warnings, see generally [Doc. 218], only that the interrogation occurred after he was brought to the deputy room to meet with Agent Moreman and Sgt. Worden, [id. at 2-3, 5-6].  Lopez contends that Agent Moreman initiated the questioning by asking, "What do you want to talk to us about?" [Id. at 3]; (Tr. at 15, 33, 60).  However, Lopez's argument ignores the context of Agent Moreman's question.  It is undisputed that Lopez requested the meeting with the law enforcement officers, and Agent Moreman's question merely sought clarification of the purpose of the meeting that Lopez requested, and such clarifying questions in response to communication initiated by an individual in custody does not amount to interrogation.  Indeed, "statements made in response to a law enforcement officer's 'attempt to seek clarification' of a defendant's remarks, during an interview requested by the defendant, are not the 'products of interrogation.'"  United States v. Koontz, 143 F.3d 408, 411 (8th Cir. 1998) (quoting Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir.1989), cert. denied, 496 U.S. 909 (1990)); see also United States v. Rommy, 506 F.3d 108, 133-34 (2d Cir. 2007) ("[A]bsent extraordinary circumstances, a court may generally conclude that follow-up

10

questions asking only for volunteered information to be repeated or spelled do not constitute interrogation."); United States v. Gonzales, 121 F.3d 928, 940 (5th Cir.1997), overruled in part on other grounds by United States v. O'Brien, 130 S.Ct. 2169, 2180 (2010), as recognized in United States v. Johnson, 398 F. App'x 964, 966-68 (5th Cir. 2010) (per curiam) (unpublished) ("[W]hen a suspect spontaneously makes a statement, officers may request clarification" of ambiguities "without running afoul of the Fifth Amendment").  Thus, the statements Lopez made in the July 16 meeting that he requested were not the product of interrogation or its functional equivalent, and Miranda warnings were not required.

Although Miranda warnings were not required, the government must still demonstrate that Lopez voluntarily made the statements on July 16 before the statements may be used at his trial.  Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.  United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).  "This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"  United States v. Villaverde-Leyva,

Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).  "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police."  Id. (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement:  "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345.  "Those cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'"  United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a

confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted).

The totality of the circumstances demonstrate that Lopez voluntarily made the statements on July 16 at his cell and during the subsequent meeting he requested with Agent Moreman and Sgt. Worden.  There is no evidence of any unlawful coercion as it was Lopez who inquired about "helping himself out" and requested to meet with law enforcement agents when Sgt. Worden delivered the forfeiture notice to his cell.  (Tr. at 12).  The meeting in the deputy room, an open area at the jail, lasted only five to ten minutes, and was a "laid back" conversation during which Lopez expressed his interest in "helping himself out" and his motivation for doing so.  (Tr. at 14-17, 60-61).  Although Lopez was certainly in custody, there is no evidence that any physical force was used against him or that any threats or promises were made to induce him to make any statements on July 16, and as discussed already, Lopez was not subjected to interrogation.  (Id.).  Accordingly, the record demonstrates that Lopez voluntarily made the statements on July 16.[11]

_____

[11] Lopez complains in a couple of sentences of his post-hearing brief that a recording of the July 16 statement was made at the jail but not preserved.  [Doc. 218 at 6].  He does not allege that any government agents purposefully destroyed the recording, [id.], and according to Sgt. Worden, the deputy room at the jail had "an ongoing recording feed" that automatically recorded the July 16 interaction with Lopez, (Tr. at 16-17), but the recording was lost because the recording system at the jail crashed in December, 2014, and had to be replaced, (Tr. at 36-37).  Since Lopez

**B.**   **July 22, 2014 Statements**

The interview on July 22, 2014, clearly was a custodial interrogation, and Agent Moreman testified that he advised Lopez of his <u>Miranda</u> rights at the beginning of the interview, and that Lopez indicated that he understood his rights and waived them, and agreed to proceed with the interview.  (Tr. at 63-64, 77). Lopez disputes that he was properly advised of and waived his rights, [Doc. 218 at 6], but the evidence of record is to the contrary.

Statements made in response to custodial interrogation are admissible only if the defendant was informed of his <u>Miranda</u> rights and waived them.  A defendant may waive his rights if the waiver is made voluntarily, knowingly, and intelligently. <u>Miranda</u>, 384 U.S. at 444.  The government bears the burden of proving by a preponderance of the evidence that defendant validly waived his <u>Miranda</u> rights.

---

has not asserted, much less shown, any bad faith destruction of the recording, there is no basis for finding a due process violation, <u>see</u> <u>United States v. Ashlock</u>, 224 F. App'x 803, 805 (10th Cir. 2007) (unpublished) (citing <u>California v. Trombetta</u>, 467 U.S. 479 (1984)), and failure to preserve the recording is not a basis for suppressing the statements because courts "have held that incriminating statements are not inadmissible simply because the police failed to record or take notes of the conversations," <u>Jenner v. Smith</u>, 982 F.2d 329, 331 n.2 (8th Cir. 1993); <u>see also</u> <u>United States v. Williams</u>, 429 F.3d 767, 772 (8th Cir. 2005) (noting that recording of interviews is not constitutionally required); <u>United States v. Valdez</u>, 880 F.2d 1230, 1233 (11th Cir. 1989) (finding inculpatory statements admissible although officers failed to take notes or record statements).

14

United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997); see also Connelly, 479

U.S. at 168.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

Patterson, 2007 WL 2331080, at *3 (quoting United States v. Barbour, 70 F.3d 580, 585

(11th Cir. 1995)); see also Moran, 475 U.S. at 421; Edwards v. Arizona, 451 U.S. 477,

482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979); Schneckloth, 412 U.S. at 226.

The voluntariness analysis often depends on whether "the defendant's will was

overborne."  Lynumn v. Illinois, 372 U.S. 528, 534 (1963).  Thus, to find that a waiver

was involuntary, "coercive police activity is a necessary predicate."  Connelly, 479

U.S. at 167.  See also Moran, 475 U.S. at 421 (relinquishment of Miranda right must

be the product of free and deliberate choice rather than intimidation, coercion, or

deception).  Therefore, "in the absence of police coercion, a court cannot conclude

a defendant's waiver or inculpatory statements are involuntary."  United States v.

Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

"A valid waiver, however, requires more than just a finding of voluntariness. In addition to being voluntary, a waiver of *Miranda* rights must also be knowing and intelligent." Id. (citation omitted).  In contrast to a finding of voluntariness, "a court need not find coercion in order to find a defendant's waiver unknowing or unintelligent." Id. (citation omitted).  No single factor is determinative of the issue of whether a defendant knowingly and intelligently waived his Miranda rights, "but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3.  "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'" Minard, 208 F. App'x at 660 (quoting Moran, 475 U.S. at 421).  However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver.  United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).

The uncontested testimony of Agent Moreman at the evidentiary hearing satisfies the government's burden of establishing that Lopez knowingly, voluntarily, and intelligently waived his rights and agreed to speak with the agents during the interview.  Agent Moreman testified that he read Lopez his Miranda warnings from

a DEA-13A card.[12]  (Tr. at 63).  Although Agent Moreman did not read the content

of the card into evidence and the government did not tender it as an exhibit at the

evidentiary hearing, his undisputed testimony that he read the <u>Miranda</u> warnings

from the DEA-13A card to Lopez at the outset of the interview is sufficient to prove

by a preponderance of the evidence that Lopez was advised of his <u>Miranda</u> rights

on July 22, 2014.  <u>United States v. Drummond</u>, 482 F. App'x 686, 690 (3d Cir. 2012)

(unpublished) (affirming district court's determination to credit testimony of agent

that he read <u>Miranda</u> warnings from a DEA-13A card in finding that defendant was

advised of rights even though agent never specified what he told the defendant and

the card was not entered into evidence); <u>In re Terrorist Bombings of U.S. Embassies</u>

---

[12]  A DEA-13A card states:

Before we ask you any questions, you must understand:
—You have the right to remain silent.
—Anything you say can be used against you in court.
—You have the right to talk to a lawyer for advice before we ask you
any questions and to have a lawyer with you during questioning.
—If you cannot afford a lawyer, one will be appointed for you before
any questioning if you wish.
Do you understand?
Are you willing to answer some questions?

<u>United States v. Acosta</u>, 807 F. Supp. 2d 1154, 1173 (N.D. Ga. 2011), adopted at 1168;
<u>United States v. Gastelo</u>, No. 3:13-CR-00264-FDW-DSC, 2014 WL 1831029, at *4
(W.D.N.C. May 8, 2014).

in E. Africa, 552 F.3d 177, 209 (2d Cir. 2008) (affirming district court's reliance on testimony alone to find that oral warnings were sufficient to apprise defendants of their Miranda rights); United States v. Barnard, No. CR.A.06-73-GMS, 2008 WL 331424, at *6 (D. Del. Feb. 6, 2008) (finding valid waiver where officer read Miranda warnings to defendant from the standard DEA–13A card).[13]

Agent Moreman testified that he read the warnings to Lopez in English, and Lopez appeared to understand the warnings and verbally acknowledged that he understood.  (Tr. at 63, 77).  Lopez has not argued that he did not understand the Miranda warnings because they were provided in English, only that the government has not carried its burden of proving that the warnings were provided and that he waived his rights.  See [Docs. 218 & 228].  Moreover, the record indicates that Lopez communicated in English with the three law enforcement agents who testified at the evidentiary hearing and they are not fluent in Spanish, (Tr. at 9-10, 12-14, 16, 27-28,

---

[13] To meet its burden of proving a valid waiver, the government may not rely on "presumptions or inferences that when police officers read to an accused from a card they are reading Miranda warnings or that what is read, without revelation of its contents, meets constitutional standards." Moll v. United States, 413 F.2d 1233, 1238 (5th Cir.1969).  However, the government is not relying on presumptions or inferences here because Agent Moreman testified that he read Miranda warnings to Lopez from a DEA-13A card, (Tr. at 63), not from some nondescript card, and the content of a DEA-13A card sufficiently coveys the Miranda warnings, see Drummond, 482 F. App'x at 690.

41-48, 62, 77), and there is nothing in the record to suggest that he did not comprehend the warnings provided as Agent Moreman testified, (Tr. at 63-64, 77).[14]

Lopez contends that the government has failed to prove that he waived his constitutional rights because there was no proof that he signed a written waiver. [Doc. 218 at 6]. However, "the Fifth Amendment does not require a written *Miranda* waiver, and [Lopez's] oral waiver was sufficient." United States v. Griffin, Criminal No. 08–322(2)(DSD/SRN), 2009 WL 36390, at *1 (D. Minn. Jan. 6, 2009) (citing United States v. Williams, 429 F.3d 767, 772 (8th Cir.2005)); see also United States v. Guzman, 603 F.3d 99, 106 (1st Cir. 2010) (citation omitted) ("Oral waivers of *Miranda* rights are sufficient[.]"). Indeed, "an express oral or written waiver of *Miranda* is strong proof of the validity of the waiver." United States v. Degaule, 797 F. Supp. 2d 1332, 1378 (N.D. Ga. 2011), adopted at 1344 (citation omitted). Agent Moreman credibly testified that Lopez orally waived his rights and agreed to proceed with the interview after being advised of his rights. (Tr. at 63-64).

To find a waiver involuntary, "coercive police activity is a necessary predicate." Connelly, 479 U.S. at 167. However, there is no evidence in the record of any unlawful coercion of Lopez on July 22. The interview was scheduled at his

---

[14] On July 11, Lopez interpreted for Ochoa the instructions provided by the officer in English regarding obtaining DNA samples. (Tr. at 45).

request, and it was conducted in a room at the jail where he was seated at a table with two law enforcement agents.  Lopez may have remained handcuffed and shackled during the interview, but there is no evidence of any physical force or threats being employed against him.  Indeed, Agent Moreman testified that the tone of the interview was a "friendly conversation," and he did not intimidate or mistreat Lopez or observe anyone else do so.  (Tr. at 66).  Although Agent Moreman had a firearm, it remained holstered and concealed throughout the interview, and IRS White did not carry a firearm.  (Tr. at 65-66).  Nor did Agent Moreman make any promises to Lopez to induce him to speak against his will, and he simply told Lopez at the conclusion of the interview that he would make the prosecutor aware of any cooperation he provided.  (Id.).  Accordingly, the totality of the circumstances demonstrate that Lopez knowingly, voluntarily, and intelligently waived his rights.[15]  See United States v. Telcy, 362 F. App'x 83, 86–87 (11th Cir. 2010) (per curiam) (unpublished) (finding voluntary consent where defendant was in handcuffs and in custody because officers did not employ any coercive tactics, brandish their weapons, or threaten, lie, or otherwise pressure defendant to consent to search); United States v. Manson, Criminal Indictment No.

---

[15] The record similarly supports finding that Lopez voluntarily made the statements on July 22.  There is simply no evidence of any unlawful coercion in connection with the interview on that date for the reasons discussed.

1:11–CR–13–AT–LTW–2, 2012 WL 2861595, at *2 (N.D. Ga. July 11, 2012) (footnote and citation omitted) ("[W]hile the Defendant's interrogation while he was handcuffed and under arrest might have carried some inherent intimidation, the overall circumstances of the interrogation were not sufficiently coercive as to vitiate the voluntariness of Defendant's statements.").

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Lopez's motion to suppress statements, [Doc. 152], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial as to all defendants.

**IT IS SO ORDERED AND RECOMMENDED**, this 16th day of September, 2015.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE